People of the State of Illinois, Plaintiff-Appellee, v. Melvin Bethea, Defendant-Appellant.

Gen. No. 50,033.

First District, Third Division.
September 16, 1965.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Albert Friedman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Klein, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

On a trial by the court without a jury, the defendant was convicted of burglary and sentenced to two to six years in the penitentiary. The building involved was the Psi Upsilon Fraternity House at 5639 University Avenue, Chicago, occupied by University of Chicago students. The time was 9:30 p. m. on Sunday, April 26, 1964.

The only issue on appeal is whether the defendant entered the house with the required intent. The principal witness on behalf of the state was Robert Wulff, a student at the University and resident of the fraternity. He occupied a second floor bedroom. He testified that he left his room to go to the washroom on the same floor, and that he closed the door of his room but did not lock it. When he returned, the door was open and defendant was standing three or four feet inside the room. Wulff asked him what he was doing there and defendant said he was looking for a rest room, that he had asked a couple of boys on the first floor where it was and was told it was "up here on the second floor." Wulff showed him how to get to the rest room. Wulff then went downstairs and had a conversation with the ten or fifteen fraternity members who were there, after which he and several of the others went up to the second floor to "seize" the defendant. Wulff was not permitted to testify as to what he had said to his fellow members that caused

them to go upstairs immediately. The inference is clear, however, that they denied that any of them had directed defendant to a toilet or rest room on the second floor and concluded he was not there for any legitimate purpose. The students waited outside the bathroom door and when defendant came out, Wulff again asked him what he was doing there. This time defendant showed Wulff a slip of paper on which the name "Meyer" was written, the name of a student supposed to be living in the fraternity house and from whom defendant said he wanted to get some information about enrolling in the University, and wanted to know where the Administration Building was. Wulff then called the police. Nothing was taken from his room nor had anything been disturbed. Later that night a boy from a fraternity "up the street" came in and said he had given the name of Meyer to defendant, but had not said anything about the defendant's going to the fraternity house. Wulff was sure no address was on the paper, but did not remember whether it contained any other writing besides the name "Meyer."

The policeman who made the arrest testified that he had a conversation with defendant, that he asked him his purpose in being in the fraternity house, and that defendant told him he had been sent by some person whose name was unknown.

Defendant was twenty years old. He testified he was a graduate of Dunbar High School and lived at 5207 Calumet Avenue, Chicago, with his mother and stepfather; that on the night in question he had finished unloading a truck at 63rd Street and Cottage Grove Avenue, and since it was a fine night, decided to walk east to 52nd Street and Blackstone Avenue, instead of taking a bus; that in the vicinity of 56th street and University Avenue he came upon a student loading books in a car. He offered to help and while

loading the books said he too would like to be a student and that he wanted to study electronics. The student gave him the name of Robert Meyer, saying Meyer would help him, and directed defendant to a building three or four houses away from the Psi Upsilon Fraternity. Defendant said he entered that building and spoke to one John Starch, who wrote Robert Meyer's name on a card and his own name (Starch) and address also. Defendant took the card, went into one of the university phone booths and looked in the telephone book. There he came upon the Psi Upsilon Fraternity address under Meyer's name. Noticing that the address was in the vicinity, he walked to the fraternity house and went in. The light was on in the living room on the first floor, but he did not see any one in the room, did not see a television set on, and did not see any bells or names. He walked up to the second floor, knocked on the first door he came to and when no one answered, turned to go downstairs when he first met Wulff; that when Wulff asked him what he wanted, defendant showed him the card and Wulff said there was no Robert Meyer living there and added "if I wanted information the best thing to do would be to come back to the administration building on Monday." Defendant then asked where the washroom was and repeated his story when confronted by Wulff and the others.

Wulff testified that the University of Chicago did not offer courses in electronics, the subject in which defendant said he was interested, that it was possible to get from the first to the second floor of the house without being seen from the living room, and that about fifteen or twenty fraternity members were present in the living room at the time of the incident. Neither the slip of paper nor the telephone book with Meyer's name in it was produced at the trial.

■ ■ Defendant argues that the state failed to prove the requisite intent. The crime of burglary is complete upon entering with intent to steal and it is not essential to allege or prove that anything was taken. People v. Figgers, 23 Ill2d 516, 179 NE2d 626. In People v. Johnson, 28 Ill2d 441, 192 NE2d 864, the court said, p 443:

> "Intent must ordinarily be proved circumstantially, by inferences drawn from conduct appraised in its factual environment. We are of the opinion that in the absence of inconsistent circumstances, proof of unlawful breaking and entry into a building which contains personal property that could be the subject of larceny gives rise to an inference that will sustain a conviction of burglary. Like other inferences, this one is grounded in human experience, which justifies the assumption that the unlawful entry was not purposeless, and, in the absence of other proof, indicates theft as the most likely purpose."

In the instant case, the issues of unlawful entry and intent depend upon the credibility of the state's evidence as against that of the defendant.

Obviously the trial judge did not believe defendant's explanation and felt that his testimony only showed he had prepared an explanation of his presence in the house in case he should be accosted. Even standing alone, defendant's testimony is hardly credible. His reasons for going to 52nd Street and Blackstone Avenue, when he lived at 5207 Calumet Avenue, a mile or more away, were not explained. It is not clear from his testimony whether he used a public or university telephone directory to find Meyer's address. Defense counsel said on oral argument he had been unable to find Meyer's name in any directory. It is not an un-

common name, and it is not explained how the defendant, if he used the ·public directory, could have been certain he wanted the Psi Upsilon Robert Meyer.

The important conflict between the defendant's and Wulff's testimony should be noted, that is, the fact that Wulff said defendant was inside his room when he first saw him, thus making clear 'that defendant had opened the closed door, which defendant denied, and that defendant said he had turned to go downstairs when he first met Wulff. This and other conflicts on vital points of the case discredit defendant's testimony. Neither Starch nor Meyer were produced to support the defendant's story. Defendant's counsel suggests that defendant could have been present in the fraternity house "pursuant to a subtle prank endogenous with college fraternities, which developed from an innocent and innocuous beginning into a sinister, albeit unintended, denouement." Evidently he meant that the first student whom defendant testified he met had the idea of prepetrating a hoax on him (the defendant). This is a rather fanciful suggestion and would have required the cooperation of the students involved. It does not appear that these students had any contact with each other at any time.

Defendant argues that in People v. Hutchinson, 50 Ill App2d 238, 200 NE2d 416, the court said, "where an act may be attributed to a criminal or to an innocent cause it will be attributed to the innocent cause rather than the criminal one." There the defendant at about 3:15 in the afternoon overtly parked his automobile bearing his license plates and walked into the complainant's backyard with a book in his hand, in full view of two men. He was seen in the complainant's kitchen for about five minutes and then was seen leaving. Nothing was broken into nor was anything taken. The defendant did not take the stand to testify in his own behalf. The court reversed a con-·

94

viction for burglary on the grounds of failure to prove an intent to commit burglary. The defendant's actions in that case were consistent with those of a salesman or other similar type of calling. He left the premises without taking anything.

■■ In the instant case, when asked on oral argument how defendant could reasonably explain his presence on the second floor of the fraternity house at 9:30 on a Sunday evening, instead of knocking at the front door, defense counsel pointed out that the testimony indicated he walked in, saw no names, was presumably unfamiliar with a fraternity house or fraternity life; that he might have equated the fraternity house with a boarding house; that he saw no one on the first floor and proceeded to the second floor to knock on doors to see if any one was around. Defendant is a high school graduate, and it appears to us that making all due allowances, this is not an adequate explanation of his presence in the house and in the room on the second floor. In a bench trial in a criminal case, the trial court's judgment based upon the credibility of witnesses will not be disturbed unless it is based on clearly unsatisfactory and improbable evidence. People v. Johnson, 47 Ill App2d 441, 198 NE2d 173; People v. Cobb, 52 Ill App2d 332, 202 NE2d 56. Where the evidence is conflicting and the issue of reasonable doubt depends on credibility, a reviewing court will not substitute its judgment for that of the trier of fact. People v. Clark, 30 Ill2d 216, 195 NE2d 631.

Following the finding of guilty, the trial court heard testimony with respect to punishment. It was then submitted to the court that defendant had been four times convicted of larceny and petty theft and twice of assault and battery and that he had been released from Vandalia the day before the commission

of the offense in question. The court then imposed the penalty hereinbefore referred to.

■ Defendant's story is in the important aspects hereinbefore referred to of such doubtful veracity that, recognizing the trial court's superior position to judge credibility, we must accept the finding that defendant was guilty beyond a reasonable doubt.

Judgment affirmed.

DEMPSEY, P. J. and SULLIVAN, J., concur.